T.C. Memo. 1998-231


UNITED STATES TAX COURT


STEPHEN D. PODD, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 20225-93, 20226-93,        Filed June 30, 1998.
            20227-93, 20228-93,
            20229-93,  6209-94,
             6210-94,  6211-94,
             6212-94,  6213-94,
             6214-94.


Kevin M. Flynn and Julian W. Dority, for petitioners.

John Aletta, Elise Frost Alair, and Bradford A. Johnson, for

respondent.

_____

[1]    The following cases are consolidated herewith for purposes
of trial, briefing, and opinion:  Victor I. Podd, docket No.
20226-93; Victor T. Podd, docket No. 20227-93; Powertex, Inc.,
docket No. 20228-93; Powertex, Inc., docket No. 20229-93;
Powertex, Inc., docket No. 6209-94; Victor T. Podd, docket No.
6210-94; Victor I. Podd, docket No. 6211-94; Stephen D. Podd,
docket No. 6212-94; Julia Podd, docket No. 6213-94; and Powertex,
Inc., docket No. 6214-94.

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  Respondent determined deficiencies, additions to tax, and penalties in petitioners' Federal income taxes as follows:

<u>Stephen D. Podd, docket Nos. 20225-93, 6212-94</u>:

| <u>Year</u> | <u>Deficiency</u> | Penalties <u>Sec. 6662(a)</u> |
|---|---|---|
| 1988 | $463 | – |
| 1989 | 12,654 | $2,530.80 |
| 1990 | 61,674 | 12,335.00 |

<u>Victor I. Podd, docket Nos. 20226-93, 6211-94</u>:

| <u>Year</u> | <u>Deficiency</u> | Penalties <u>Sec. 6662(a)</u> |
|---|---|---|
| 1988 | $951 | – |
| 1989 | 12,065 | $2,413 |
| 1990 | 135,094 | 27,019 |

<u>Victor T. Podd, docket Nos. 20227-93, 6210-94</u>:

| <u>Year</u> | <u>Deficiency</u> | Additions to Tax <u>Sec. 6653(a)(1)</u> | <u>Sec. 6661</u> | Penalties <u>Sec. 6662(a)</u> |
|---|---|---|---|---|
| 1988 | $48,402 | $2,402 | $12,101 | – |
| 1989 | 475,634 | – | – | $95,127 |
| 1990 | 68,637 | – | – | 13,727 |

<u>Julia Podd, docket No. 6213-94</u>:

| <u>Year</u> | <u>Deficiency</u> | Penalties <u>Sec. 6662(a)</u> |
|---|---|---|
| 1990 | $52,277 | $10,455 |

<u>Powertex, Inc., docket Nos. 20228-93, 6214-94</u>:

| Tax Year <u>Ended</u> | <u>Deficiency</u> | Additions to Tax Under Section <u>6653(a)(1)(A)</u> | <u>6653(a)(1)(B)</u> | <u>6653(a)</u> | <u>6661</u> | Penalties <u>6662(a)</u> |
|---|---|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| 5/31/88 | $89,534 | $6,570 | [1] | – | $32,850 | – |
| 5/31/89 | 311,413 | – | – | $17,869 | 89,345 | – |
| 5/31/90 | 514,390 | – | – | – | – | $102,878 |

[1] 50 percent of the interest due on $148,814.

Respondent determined deficiencies in, additions to tax, and penalties in, Powertex, Inc.'s withholding tax as follows:

Powertex, Inc., docket Nos. 20229-93, 6209-94:

| Tax Year Ended | Deficiency | Additions to Tax Under Section | | | | | | Penalties |
|---|---|---|---|---|---|---|---|---|
| | | 6651 | 6653(a) | 6653(a)(1)(A) | 6653(a)(1)(B) | 6656 | 6661 | Sec. 6662(a) |
| 5/31/85 | – | – | – | – | – | 167 | – | – |
| 5/31/86 | $412,425 | $103,776.50 | – | $20,621.25 | [1] | 41,510.60 | $103,106.25 | – |
| 5/31/87 | – | – | – | – | – | 136 | – | – |
| 5/31/88 | 48,206 | 12,454 | $2,410.30 | – | – | 4,981.60 | 12,051.50 | – |
| 5/31/89 | 487,975 | – | – | – | – | 50,106.90 | – | $100,213.80 |
| 5/31/90 | 245,882 | – | – | – | – | 24,588 | – | 49,176 |

[1] 50 percent of the interest due on the deficiency.

Pursuant to amended answers, respondent asserts increased deficiencies, additions to tax, and penalties in petitioners' Federal income taxes.[2]

---

[2] The increased deficiencies result from respondent's assertion of additional constructive dividends to the individual petitioners which, correspondingly, results in increased additions to tax and penalties. Specifically, respondent amended his answers to assert that certain payments deducted as management fees paid by Powertex, Inc. to Powertex Plus International, Inc. resulted in constructive dividends. The amendments to answer assert such constructive dividends against several of the individual petitioners in addition to those against whom constructive dividends were determined in the notices of deficiency. The amendments to answer also raise an alternative argument that if these payments are not constructive dividends, they should be characterized as compensation income to the individual petitioners.

Respondent also amended his answers with respect to certain royalty payments that respondent determined were not ordinary and necessary business expenses pursuant to sec. 162. In the notices of deficiency, respondent's alternative position was that the royalty rate should be adjusted, pursuant to sec. 482, to 5 percent. By way of amended answers, respondent asserts that the
(continued...)

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

STATEMENT OF ISSUES

After concessions,[3] the issues remaining for decision are:

1. Whether petitioner Powertex, Inc., is entitled to deduct certain royalty payments paid to certain individual petitioners, or whether an adjustment under section 162 or section 482 is warranted;

2. whether consulting fees paid by Powertex, Inc., to Special Commodities Services, Inc., are ordinary and necessary business expenses deductible under section 162;

3. whether amounts deducted by Powertex, Inc., as management fees paid to Powertex Plus International, Inc., are reasonable payments for services rendered;

4. whether the individual petitioners received constructive dividends;

---

[2](...continued)
appropriate royalty rate pursuant to sec. 482 should be 0 percent. Correspondingly, respondent amended his answers to increase the constructive dividends asserted against several of the individual petitioners.

Respondent bears the burden of proof with respect to the increased deficiencies, additions to tax, and penalties pleaded in the amended answers. Rule 142(a). In light of our holdings with regard to the issues raised in the amended answers, however, the location of the burden of proof is immaterial.

[3]    Petitioners conceded several issues in the stipulations of facts. Additionally, to the extent they did not address other issues on brief, we consider such issues to have been conceded. Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988).

5.   whether petitioner Victor I. Podd was a resident of the United States during 1990; and

6.   whether petitioners are liable for certain additions to tax and penalties as determined by respondent.

For convenience and clarity, we have divided our opinion into separate segments.  The first segment sets forth general findings of fact applicable to all of the issues in the instant case.  Each of the segments following our general findings of fact discusses one of the separate issues set forth above and sets forth our findings of fact and opinion concerning the respective issue.

I.   General Findings of Fact

Some of the facts have been stipulated for trial pursuant to Rule 91.  The stipulations of facts are incorporated herein by reference, and they are found accordingly.

At the time its petition was filed, in the instant case, Powertex, Inc. (Powertex) was a New York corporation.  Powertex's principal corporate office was located at Rouses Point, New York. At the time they filed their petitions in the instant case, petitioners Victor T. and Julia Podd resided in Mount Royal, Quebec, Canada; petitioner Stephen D. Podd resided in North Hero, Vermont; and petitioner Victor I. Podd resided in Boca Raton, Florida.

A.   Founding of Powertex

Powertex was incorporated under the laws of the state of Vermont in 1977 by petitioner Victor T. Podd (Mr. Podd), his wife petitioner Julia Podd (Mrs. Podd), and his brother Alexander Podd.

The original name of the corporation was Powerstrap, Inc., which was subsequently changed to Powertex Corporation, Inc., in 1979 and finally to Powertex, Inc., in 1984. Powertex was initially formed to be a packaging manufacturer. Powertex began its business operations in Alburg, Vermont, on property owned by Mr. Podd. In 1984, Powertex expanded its business from the Alburg facility to a new manufacturing plant in Rouses Point, New York.

From 1977 through 1992, Mr. Podd was the president, chief executive officer and largest shareholder of Powertex, and Mrs. Podd was its corporate secretary and treasurer. From 1983 through 1990, their children, Victor I. Podd (Victor, Jr.), and Stephen D. Podd (Stephen), served as vice presidents of Powertex. From 1977 through 1990, all of the outstanding stock in Powertex was owned by Mr. Podd, Victor, Jr., Stephen, and Mrs. Podd. From 1977 through 1990, Mr. Podd and his two sons (collectively, the Podds) and Mrs. Podd were Canadian citizens.

Today, Powertex is a manufacturer of several products used in the shipping industry. The core products sold by Powertex are intermodal container liner systems, used to transport such dry bulk flowable products as rice, corn, sugar, carbon black, and PVC resins. Intermodal cargo containers come in either 20-, 35-, or 40-foot lengths, and can carry up to 24 tons of cargo. An intermodal container liner is a plastic liner placed inside a shipping container for the purpose of protecting the contents from loss and contamination during shipment and to prevent corrosion of the

container itself.  Essentially, the liner is a large plastic bag which conforms to the interior dimensions of the intermodal container.  The liner is attached to a bulkhead which acts as a sidewall and holds the cargo in the container, and which contains a portal through which the cargo is loaded and unloaded.  After installation and inflation of the liner system inside the container, cargo can then be conveyed into the container.  The container is then transported by rail, truck, or ship.

Powertex currently manufacturers three principal types of intermodal container liner systems.

B.  <u>The Hideliner</u>

One of Powertex's earliest products consisted of an intermodal container liner system known as the hideliner.  During the 1970's, Mr. Podd became acquainted with several employees of Sea-Land Service, Inc., (Sea-Land), a company engaged in the commercial transportation business.  Sea-Land shipped raw green animal hides packed in salt.  The hides released contaminating fluids which, combined with the salt, had a caustic effect on the containers in which they were shipped.  In response to this problem, Mr. Podd developed the hideliner (also known as the powerliner) to be used for shipping raw green animal hides.

Essentially, the hideliner consists of a base sheet of foam material and a top cover sheet of polymeric material which is bonded to the base sheet, and which extends over at least a portion of the

walls of the container. As designed, it constitutes a liquid impervious liner useful in the transportation of raw animal skins.

Mr. Podd filed a patent application for the hideliner with the U.S. Patent and Trademark Office on August 1, 1978. On February 5, 1980, the U.S. Patent and Trademark Office issued United States Patent No. 4,186,845 (the '845 patent) covering the hideliner invention.

On May 21, 1980, Mr. Podd licensed to Powertex the exclusive right to manufacture, market, and sell the hideliner. The terms of the agreement granted Powertex an exclusive 6-year license in exchange for royalties of 5 percent during the initial six-year term of the license and 7 ½ percent during any extensions of the license. The license agreement was renewed on November 30, 1985, for an additional 6-year term.

C. The Sea Bulk Liner

On October 26, 1970, and February 9, 1972, Bert A. Bodenheimer, an employee of Sea-Land, filed patent applications for what would eventually come to be known as the Sea Bulk container liner system. United States patent numbers 3,696,952 and 3,868,042 (collectively, the Sea Bulk patents) were issued on October 10, 1972, and February 25, 1975, respectively, as a result of these applications. These patents were subsequently assigned to Sea-Land by Mr. Bodenheimer. The Sea Bulk liner system was designed for use in shipping products in dry bulk form and also protects products against contamination and seepage during transport.

During the 1970's and through May 1983, Sea-Land licensed the exclusive rights to manufacture, market, and sell products covered by the Sea Bulk patents to Tri-Wall Containers (Tri-Wall). The terms of the license agreement provided that Tri-Wall would pay royalties to Sea-Land at an initial rate of 8 percent of net sales of Sea Bulk liners for the first year of the agreement, 9 percent for the second year, and 10 percent thereafter.

In March 1981, Raymond Stopper founded Insta-Bulk, Inc., (Insta-Bulk) in Houston, Texas. Insta-Bulk, like Powertex, was engaged in the business of manufacturing and selling intermodal container liners for use in the transportation industry. During 1982, a dispute developed between Insta-Bulk, Sea-Land, and Tri-Wall concerning whether Insta-Bulk was manufacturing and selling liners which infringed upon the Sea Bulk patents. During 1982, Insta-Bulk filed a request for declaratory judgment with the United States District Court in New York alleging that the Sea Bulk patents were invalid and unenforceable and that it was not infringing upon the Sea Bulk patents. Sea-Land and Tri-Wall counterclaimed for damages resulting from Insta-Bulk's alleged disclosure of Tri-Wall's trade secrets and for infringement of the Sea Bulk patents by Insta-Bulk.

Sea-Land eventually became dissatisfied with Tri-Wall's performance and therefore terminated its license agreement during or around May 1983. On May 5, 1983, Powertex entered into an exclusive license agreement with Sea-Land for use of the Sea Bulk patents (Sea-Land license agreement). The Sea-Land license agreement

required, for all Sea Bulk liners sold within the ocean container industry, that Powertex pay Sea-Land a royalty of 10 percent of net sales of Sea Bulk liners, and expend a minimum of 10 percent of net sales of Sea Bulk liners for the purpose of marketing, advertising, and promotion of Sea Bulk liners.  For Sea Bulk liners sold outside the ocean container industry, Powertex was required to pay Sea-Land a royalty of $10 for every Sea Bulk liner sold, and to expend $10 for each unit sold for the purpose of research and development of markets outside of the ocean container industry.  The Sea-Land license agreement was amended on January 17, 1985, to provide that Powertex would pay royalties quarterly at the rate of 10 percent for the first 5,000 Sea Bulk liners sold, 7 ½ percent for the next 2,500, and 5 percent for all units over 7,500.  On February 21, 1986, the agreement was again amended, this time to provide that Powertex would pay royalties quarterly at the rate of 5 percent of net sales of Sea Bulk liners.

On May 26, 1983, Powertex entered into a sublicense agreement with Insta-Bulk for use of the Sea Bulk patents.  The agreement allowed Insta-Bulk to manufacture, market, and sell liners covered by the Sea Bulk patents in Louisiana and Texas.  The agreement provided that Insta-Bulk would pay royalties to Powertex at the rate of 18 percent of net sales of Sea Bulk liners for use in the ocean container industry for the first year, and at the rate of 20 percent of net sales thereafter.  For liners sold for use outside of the ocean container industry, Insta-Bulk was required to pay Powertex

$20 for each Sea Bulk liner sold. On May 27, 1983, Insta-Bulk and Sea-Land settled their litigation, with Insta-Bulk agreeing to the validity and enforceability of the Sea Bulk patents and to infringement of one or more of the claims of the patents. Effective January 1, 1989, the royalty rate for the Insta-Bulk sublicense was reduced to 13 percent. On March 15, 1991, Powertex terminated its sublicense agreement with Insta-Bulk.

D.  The Amoco-Style Liner

During mid-1985, Gene Rakar of Amoco Chemical Company (Amoco) approached Mr. Podd concerning the feasibility of using intermodal container liners to transport pure terephthalic acid (PTA), a fine, white powder used to make polyester fiber. In the fall of 1985, Mr. Podd invited Mr. Rakar, Frank Hall (Amoco's Marketing Product Manager), and Tracy Sommer (an engineer at Amoco) to observe a test loading of a Sea Bulk liner at General Electric, a Powertex customer, in Selkirk, New York. After witnessing the demonstration, the Amoco personnel determined that the Sea Bulk liner was not acceptable for shipping PTA, due to the 2 to 3 hour loading time, which needed to be shortened to approximately 15 minutes. Additionally, Amoco needed a liner that was moisture sensitive and utilized a center discharge opening in order to be compatible with their customers' unloading equipment. A short time later, Amoco employees visited another Powertex customer in New Orleans to witness another loading demonstration.

Initial testing of the Sea Bulk liner supplied by Powertex began in late 1985 and early 1986 at Amoco's Cooper River plant. The Powertex plant at Rouses Point, New York, manufactured the test liner. Mr. Podd worked closely with Mr. Rakar, Mr. Sommer, and Mr. Hall in testing and modifying the liner in order to meet Amoco's needs. Initially, the Sea Bulk liner was modified by providing a center discharge opening in order to fit the unloading equipment of Amoco's customers. The liner was inadequate for unloading PTA, however, due to its poor flow characteristics, which resulted in the product's gathering in the corners and tearing of the liner when discharging. In order to remedy the problem, Amoco hired contractors to install wooden triangles in the rear corners of the container by nailing them to the bracing attached to the container walls and floor.

During early 1986, Amoco asked Powertex to develop a liner and bulkhead compatible with Amoco's loading and unloading equipment and to modify the liner bulkheads to display the words "Amoco" and "PTA". On January 3, 1986, and March 5, 1986, Mr. Sommer sent letters to Powertex recommending changes in the dimensions for the inlet and outlet openings located in the liner bulkhead. From March 1986, through the following several months, Amoco and Powertex personnel continued to test and modify the liner. During that period, the liner was modified by attaching the triangles to the rear bulkhead. The size and dimensions of the triangles were subsequently modified to facilitate the discharge of the PTA.

On April 22, 1986, Mr. Podd, as president of Powertex, wrote to Attorney Kenneth L. King of the law firm Scully, Scott, Murphy & Presser in Garden City, New York, to request that the firm represent him and Powertex in filing patent applications for the inventions resulting from the modifications which had been made to the Sea Bulk liner in order to ship PTA.

During June 1986, further changes were made to the liner based upon tests conducted at Amoco's Belgian plant, which included improving the triangular diagonals to ensure that the liner fell into place against the walls and floor of the container, installing bungee cords on the sides of the liner, and adding bracing at the rear bulkhead to prevent it from bulging upon discharge.

During July 1986, Powertex supplied Amoco with 2 or 3 modified liners which were loaded with PTA and shipped to Amoco's customers in Taiwan. Upon unloading, however, the liners completely failed, resulting in total loss of the PTA shipment. During July and August of 1986, several modified liners supplied by Powertex were loaded with PTA and shipped to Amoco's customers in Hong Kong and Taiwan. Those liners also failed to unload properly, however, because several hundred pounds of PTA remained inside the container.

In response to such problems, the liner was modified by (1) changing the angles of the triangles to allow the PTA to more easily flow out upon unloading; (2) removing the front bulkhead and replacing it with a wooden nailing strip laminated to the liner; (3) adding "shake-out straps" to assist in removing the PTA; and (4)

separating the liner from the bulkhead, thereby allowing the triangles to function without tearing the liner when the PTA was unloaded. Mr. Sommer and other Amoco engineers worked closely with Powertex in determining the proper size and shape of the triangles.

On October 16, 1986, Mr. Podd filed a patent application with the U.S. Patent and Trademark Office for an intermodal container liner system, the key features of which include a prefabricated, collapsible bulkhead that is easily installed in an intermodal container. Another important feature is the provision for hinged, triangular corner members designed to funnel the cargo towards a center discharge opening, thus preventing the product from gathering in the corners of the container upon unloading.

During late 1986, Amoco increased its purchases of the modified liner as the initial testing had been completed. During November 1986, Powertex shipped liners to Amoco's Belgian plant for testing. Amoco was not satisfied with those liners because they employed cardboard triangles which bowed under the weight of the product, thereby leaving approximately 150 pounds of PTA in the liner corners. After that test, additional improvements were made to the liner to meet the needs of Amoco's customers, including modifying the bracing system, outlet spout, and size and slope of the triangles. During August 1987, Amoco chose Powertex as its sole source of intermodal container liners because (1) Powertex and Amoco had developed a good working relationship; (2) Powertex sold its liners at a reasonable price; and (3) Powertex had agreed to build a

facility near Amoco's Cooper River plant, thus ensuring an alternative supply source should production become impaired at the Rouses Point facility.

During March 1988, Amoco and Powertex discussed entering into a purchasing agreement for Amoco's liner requirements and the opening of a second manufacturing facility near Amoco's Cooper River plant. On February 22, 1989, Powertex and Amoco executed a blanket purchase agreement. In the agreement, Amoco agreed to purchase liners for its Cooper River plant exclusively from Powertex during the 2-year period commencing January 1, 1989. The agreement was renewable by Amoco for four 1-year periods, provided estimates of Amoco's 1989 liner requirements, set forth guaranteed prices, and imposed manufacturing specifications. The agreement also allowed Powertex to supply Amoco with liners at the end of the initial 2-year period at matching prices, if a competitor offered to sell non-infringing liners at lower prices.

During 1990, the Podds incorporated Powertex South Carolina (Powertex SC) in Moncks Corner, South Carolina, which began manufacturing liners for Amoco's Cooper River plant in April of 1990. Eventually, Powertex SC came to sell 50 percent of the liners it manufactured to customers throughout the world. Powertex SC did not pay any royalties to the Podds or Powertex for its sale of the Amoco liners.

On September 27, 1988, Mr. Podd filed a patent application with the U.S. Patent and Trademark Office for certain improvements on the

October 16, 1986, application. Although Amoco made several suggestions and requests during the developmental stages of the liner system, Amoco did not assert any ownership rights in the invention. On January 24, 1989, and December 5, 1989, United States Patent numbers 4,799,607 and 4,884,722, respectively, (the Amoco patents) were issued to Mr. Podd by the U.S. Patent and Trademark Office for the invention.

Subsequently, Powertex filed applications in several countries for foreign counterpart patents concerning the Amoco liner, listing Mr. Podd as the inventor.[4] Several foreign counterpart patents were subsequently published as a result of the applications.

Powertex paid the legal expenses and filing fees for both the U.S. and foreign counterpart patents concerning the Amoco liner. On its corporate tax returns, the expenses and fees were either claimed as deductions or capitalized.

Powertex sued Insta-Bulk for infringement of the Amoco patents.[5] On December 22, 1994, in settlement of the litigation, an agreement was executed which provided that Powertex would grant Insta-Bulk a "limited, exclusive, non-transferrable license" to make

---

[4]    Petitioners contend that applications for foreign counterpart patents were filed by Powertex because at that time Canada was not a signatory to the Patent Cooperation Treaty, and, therefore, Mr. Podd could not file for such patents, but Powertex, a United States corporation, could.

[5]    It is not clear from the record why Powertex, rather than Mr. Podd, brought suit against Insta-Bulk, nor is the period in time when this suit took place disclosed in the record.

and sell to Union Carbide Corporation intermodal bulk container liners using the Amoco patents and their foreign counterparts. In exchange for such license, Insta-Bulk agreed to pay a royalty of 11 percent of the gross sales of such liners. The agreement also provided that Powertex is granted a "limited, exclusive, non-transferrable license" to make and sell to Amoco intermodal bulk container liners having inflatable air corner bags using patents owned by Raymond Stopper of Insta-Bulk. In exchange for such license, Powertex agreed to pay a royalty of 11 percent of the gross sales of such liners.

    E.    The Tri-Podd License Agreement

During late 1986, sales of Amoco liners became an increasingly significant portion of Powertex's total sales, with net profit margins for these sales increasing to 50 percent by 1989. Sales of Amoco liners accounted for the following percentages of Powertex's overall business:

| Fiscal Year | Percentage of Total Sales |
|---|---|
| 1986 | <1 |
| 1987 | 40 |
| 1988 | 69 |
| 1989 | 68 |
| 1990 | 60 |

Sales of Amoco liners contributed to significantly increased profits for Powertex, as shown below:

| Fiscal Year | Net Taxable Income |
|---|---|
| 1985 | $1,290,536 |
| 1986 | 1,351,033 |
| 1987 | 1,701,787 |
| 1988 | 4,335,176 |
| 1989 | 6,739,962 |
| 1990 | 7,174,522 |

During February 1988, Mr. Podd discussed with his accountant, Ronald R. Plante of Peat Marwick, the possibility of licensing the Amoco patents to Powertex. The discussion was motivated in part by the increasing amounts of taxable income that Powertex was expected to earn from the increased sales of Amoco liners. In May 1989, at the end of Powertex's fiscal year, Mr. Podd and Mr. Plante again discussed licensing the Amoco patents to Powertex and set the royalty rate at 15 percent of net sales of Amoco liners.

Powertex did not make any royalty payments for use of the Amoco patents during the fiscal years ending May 31, 1986, through May 31, 1988. On its Federal corporate income tax returns for the fiscal years ending May 31, 1989, and May 31, 1990, Powertex reported paying royalties of $686,034 and $531,082, respectively. On May 30, 1989, and May 30, 1990, Powertex issued checks to Mr. Podd in the amounts of $617,430.26 and $477,973.35, respectively. Such amounts represented the amounts deducted by Powertex for royalties on its Federal corporate income tax returns, less a 10-percent withholding tax payment. Each of the Podds reported one third of the amount

which Powertex deducted as royalty expenses as royalty income on their individual Federal income tax returns (Forms 1040NR).

Powertex created a ledger entitled "Royalties Payable to Victor T. Podd" in order to keep track of the royalties payable on sales of the Amoco liners. On September 27, 1990, respondent mailed an audit letter to Powertex indicating that its 1989 Federal income tax return was being audited. After respondent's audit had begun, Powertex changed the ledger's title to "Royalties Payable to Victor T. Podd, Victor I. Podd and Stephen D. Podd" and provided a copy to respondent.

During 1990, Mr. Podd and Mr. Plante began drafting a licensing agreement for the Amoco patents, using the Sea-Land agreement as a model. A written license agreement was not executed, however, until after respondent's audit had begun. During late December of 1990 or January of 1991, the Podds, individually, and Mrs. Podd, as secretary of Powertex, executed a document entitled "Tri-Podd License Agreement" which was dated "as of May 23, 1988". At the same time, the parties executed an amendment to that document dated "as of May 24, 1989". Subsequently, a second amendment to this agreement dated "as of May 29, 1990" was drafted and executed.

The Tri-Podd License Agreement provided for royalty payments to the Podds of 15 percent of Powertex's net sales of Amoco liners in exchange for the right to use the Amoco patents. The agreement's term was 6 years, commencing June 1, 1988, and renewable by Powertex

if it sold at least 5,000 Amoco liners in fiscal year 1993. The agreement further provided:

> Podd hereby grants to Powertex, for the full term of this Agreement and any extension thereof, the sole and exclusive right and license to manufacture, market and sell AMOCO STYLE units and any and all other devices, methods and processes covered by the patents and patent applications listed in the attached Exhibit A. Said right and license shall be world-wide in scope and shall include the right to use and enjoy said patent rights and permit others to use and enjoy said patent rights, including the marketing and sale of AMOCO STYLE units for uses outside of the ocean container industry.

Under the agreement, the Podds also granted a license to Powertex for the exclusive worldwide right to use the trademark "POWERLINER" in connection with products covered by the licensed patents without an additional royalty.

Powertex also agreed to assume financial responsibility to the extent of $50,000 per year, commencing on June 1, 1988, for costs incurred by the Podds or Powertex in defending and litigating patent infringement claims. The agreement provided that it would be construed and governed by New York Law. The agreement failed to identify the patents covered. The only reference to specific patents was contained in the following clause:

> (c) Powertex may terminate this Agreement as of the tenth day following the sending of a notice of such termination to Podd if any court of competent jurisdiction of last resort shall render a final adjudication holding that the AMOCO STYLE United Stated [sic] Patents (numbers 4,799,607 and 4,884,722) are invalid.

The agreement indicated that the specific patents covered were contained in Exhibit A. Exhibit A, however, was not created until 1996, and was first provided to respondent during March 1996.

The first amendment to the agreement, effective June 1, 1989, reduced the royalty rate to 12 ½ percent and obligated Powertex to assume full financial responsibility for the costs of defending and litigating patent infringement claims. The second amendment to the agreement required the Podds to disclose improvements or further inventions embodying the ideas covered by the licensed property to Powertex, and if the improvements were dominated by the licensed patents, the Podds would disclose to Powertex the method of making and using the improvements and allow it to make, use, and sell products containing such improvements royalty free. The amendment also allowed the Podds to apply for patents concerning the improvements in other countries at Powertex's expense and discretion.

II. Issue 1:  Whether Powertex Is Entitled To Deduct Royalty Payments, or Whether an Adjustment Under Section 162 or Section 482 Is Warranted

FINDINGS OF FACT

1. Respondent's Notices of Deficiency

In the notices of deficiency, respondent disallowed deductions claimed by Powertex for royalty expenses on its Federal income tax returns for the years ending May 31, 1989, and May 31, 1990, in the amounts of $686,034 and $531,082, respectively. Respondent determined that such amounts were not ordinary and necessary

business expenses under section 162 or were not expended for the purpose designated. Alternatively, respondent determined that Mr. Podd did not engage in the Amoco patent transactions between himself and Powertex at arm's length, and, accordingly, respondent made adjustments pursuant to section 482. Respondent initially determined an alternative adjustment under section 482 using a 5-percent royalty rate, resulting in a disallowance of royalty expenses claimed for the years ending May 31, 1989, and May 31, 1990, in the amounts of $457,356 and $318,649, respectively. Respondent's answer was amended to assert an arm's-length royalty rate pursuant to section 482 of 0 percent.

2. The Experts' Positions

a. Respondent's Experts

i. Joel E. Lutzker

Mr. Lutzker received his B.A. in physics from New York University and his J.D. from New York University School of Law. He has been active in the fields of patents, trademarks, and copyrights for 20 years and is currently a partner in the intellectual property law firm of Amster, Rothstein & Ebenstein.

Mr. Lutzker's reports examined the ownership of the Amoco patents and their validity and enforceability. Mr. Lutzker began by examining several different theories under which Powertex could be found to have an ownership interest in the patents. He explained that under the "corporate opportunity" doctrine, the fiduciary responsibility of a corporate officer to act in the corporation's

best interests could create an obligation to assign a patent. Such an obligation could also arise under the "alter ego" theory where the corporate officer completely dominates the affairs of the corporation. A corporation could also derive an ownership interest where there is an implied contractual relationship for the inventor/employee to assign an interest in a patent to the corporation. Additionally, when an employee is specifically hired to devote his efforts to a particular problem, any invention that results from the performance of that work belongs to the employer pursuant to the "hired to invent" doctrine. Finally, although not as strong as an actual ownership interest, a corporation that has gained "shop rights" in an invention is entitled to a royalty-free, nonexclusive license to practice the invention; i.e., where an employee conceives and perfects an invention during the hours of employment, working with the employer's materials and appliances.

After examining the relevant facts, Mr. Lutzker determined that Powertex owned the Amoco patents because of the obligations of the Podds as corporate officers, because the Podds agreed to assign the patents, and because the Podds were hired to invent. Alternatively, Mr. Lutzker determined that Powertex at least had shop rights in the patents which allowed it to use the patents without paying any royalties.

Turning to the issues of validity and enforceability, Mr. Lutzker explained that a patent is invalid if the claimed invention is not new or it is obvious in light of the knowledge in the

technical art which existed at the time that the claimed invention was conceived. He also stated that a patent will be unenforceable where the patent applicant has engaged in inequitable conduct before the U.S. Patent and Trademark Office; i.e., where the applicant breaches the duty of candor and good faith by failing to disclose all material information concerning the patentability of the invention.

After examining the circumstances surrounding the issuance of the Amoco patents, Mr. Lutzker concluded that there was "strong evidence" that both patents were unenforceable due to Mr. Podd's failure to disclose material prior art to the U.S. Patent and Trademark Office. He further concluded that a "strong argument" could be made that both patents were invalid because certain prior art renders each claim of the patents obvious.

### ii. Robert Goldscheider

Mr. Goldscheider received his B.S. in economics from Columbia University in 1951 and his J.D. from Harvard Law School in 1954. He has more than 35 years of experience in the licensing field and is a frequent lecturer on problems involving the transfer and commercialization of technology.

Mr. Goldscheider's expert report and his rebuttal report were limited to the issue of a reasonable royalty rate for a license of the Amoco patents. He indicated that the issues of "patentability and enforceability" of the patents were outside the scope of his

expertise and that he would therefore rely on Mr. Lutzker's reports as to those issues.

Essentially, Mr. Goldscheider adopted Mr. Lutzker's conclusions that the Amoco patents were invalid and unenforceable and that Powertex owned or at least had shop rights in such patents. He determined that, due to such factors, Powertex received nothing of value pursuant to the Tri-Podd license agreement and that the appropriate royalty rate should be zero percent. As an alternative position, Mr. Goldscheider determined that a 2-percent royalty may be reasonable. He arrived at that figure by starting with the 5-percent royalty rate he determined was applicable under the Sea-Land/Powertex license of the Sea Bulk patents as of May 23, 1988. He then described a hypothetical noninfringing alternative to the Amoco liner and reasoned that, because the Amoco patents could be easily circumvented by such an alternative, the royalty rate should be less than half of the 5-percent rate applicable under the Sea-Land/Powertex license of the Sea Bulk patents.

b. Petitioner's Experts

i. Donald S. Chisum

Professor Chisum currently teaches at Santa Clara University School of Law. From 1969 through 1996, he was a member of the faculty at the University of Washington School of Law. Since 1970, he has regularly written and lectured on the subject of intellectual property and patent law, and he is the sole author of a multiple volume reference treatise, Patents: A Treatise on the Law of

Patentability, Validity and Infringement.  He is also "of counsel" to the law firm of Morrison & Foerster in San Francisco.

Professor Chisum's expert report and his rebuttal report were limited to the issue of the ownership of the Amoco patents, as between Powertex and Mr. Podd.  Professor Chisum began his analysis with the general proposition that the actual human inventor owns the patent rights to an invention until those rights are transferred.  He stated that there are several exceptions to the general rule, including an express or implied contract to assign patent rights, the "hired to invent" doctrine, the "corporate opportunity" doctrine, the "alter ego" theory, and the "shop right" doctrine.

Professor Chisum examined the legal framework underpinning each of the exceptions to the general rule.  He determined that none of the exceptions apply to give Powertex an ownership interest in the Amoco patents.  Accordingly, Professor Chisum concluded that Mr. Podd has been the legal and equitable owner of the Amoco patents at all times and that any rights Powertex has in those patents derive solely from the Tri-Podd license agreement.

## ii.  Gayle Parker

Mr. Parker received his B.S. in industrial engineering from Lafayette College in 1956 and his J.D. from George Washington University in 1960.  From 1956 to 1957, he worked as a patent examiner in the U.S. Patent and Trademark Office.  From 1958 to 1979, he was the Director of Licensing and patent counsel for the National Aeronautics and Space Administration Headquarters.  Since

1979, he has been the president of Technology Licensing Corporation and "of counsel" to a patent law firm, Larson & Taylor, in Arlington, Virginia.

Mr. Parker's expert report and his rebuttal report were limited to examining the reasonableness of the royalties paid pursuant to the Tri-Podd license agreement. Mr. Parker began by analyzing the relevant factors identified in section 1.482-2(d)(2)(iii), Income Tax Regs. He determined that under the Tri-Podd license agreement, Powertex received "a can't lose, practically risk free, patent protected, competitive [sic] free, fully developed, commercially successful and a higher priced, high profit product together with a built-in, ready to purchase, large consumption customer." He concluded that a "high royalty" was warranted.

Mr. Parker calculated a reasonable rate by hypothesizing that the parties to a licensing agreement would initially determine a starting value for the royalty rate. The approach he used to determine the starting value was (1) to evaluate the royalty with reference to rates for similar patents in similar circumstances, and (2) to treat the royalty as a direct function of forecasted profits to be derived from the sale of Amoco liners.

Under the first approach, Mr. Parker considered the Powertex/Sea-Land license regarding the Sea Bulk patents and the Powertex/Insta-Bulk sublicense regarding the Sea Bulk patents to be comparable to the Amoco patents. He concluded, however, that the Tri-Podd license agreement gave many special advantages not found in

the license agreements regarding the Sea Bulk patents, and, therefore, a "much higher royalty" was justified.

Under the second approach, the parties to the license agreement would determine a royalty rate by determining a reasonable division of profits anticipated through exploitation of the licensed technology. Mr. Parker noted that, because a licensee typically assumes greater financial risk in commercializing technology, a conservative rule of thumb in royalty negotiations allocates 25 percent of the anticipated profits to the licensor. Mr. Parker noted, however, that such percentage can be negotiated upward or downward, and, because Mr. Podd brought a "strong arsenal of assets" to the licensing negotiations, he could demand a royalty rate which would entitle him to 50 to 75 percent of the anticipated profits. Mr. Parker used such an allocation of profits to determine that Mr. Podd was entitled to royalties in the range of 15.3 to 23.0 percent and that a royalty rate in the range of 12.5 to 15 percent is "definitely reasonable." In using the allocation of profits to determine a reasonable royalty rate, however, Mr. Parker used actual, rather than projected, sales data in his calculations.

### iii. George M. Thomas

Mr. Thomas received his B.S. in mechanical engineering from the University of South Carolina in 1957 and his L.L.B. from the American University Law School in 1964. From 1960 to 1964, he worked as a patent examiner in the United States Patent Office in Washington, D.C. Since 1964, he has been continuously engaged in

the practice of patent, trademark, and copyright law. He is currently the senior partner in the firm of Thomas, Kayden, Horstemeyer & Risley in Atlanta, Georgia.

Mr. Thomas prepared two expert witness reports (first and supplemental) which addressed the validity and enforceability of the Amoco patents, and the reasonableness of the royalties paid pursuant to the Tri-Podd license agreement.

Mr. Thomas began his analysis of the validity of the Amoco patents by noting that patent applications are subject to a rigorous examination process performed by a patent examiner trained in the particular technical field to which the patent application is directed. He noted that an issued patent is presumed to be valid and that one who challenges validity must prove by clear and convincing evidence that the patent is invalid. Mr. Thomas then performed a detailed analysis of each claim of the Amoco patents, and, after comparison to other patents issued for intermodal container liners, concluded that both patents were valid.

Next, Mr. Thomas analyzed the enforceability of the patents. He noted that, because of the ex parte nature of a patent application, a patent applicant has a duty to act with candor, good faith, and honesty in dealing with the U.S. Patent and Trademark Office and must disclose all prior art known to the applicant which is material to the patent application. If that duty is breached, a patent may be held unenforceable because of the inequitable conduct. In order to prove such inequitable conduct, one challenging a patent

must prove (1) materiality of prior art, (2) knowledge by the patent applicant of prior art and its materiality, and (3) failure to disclose the prior art to the U.S. Patent and Trademark Office with intent to mislead or deceive. Applying the foregoing standard to the facts of the instant case, Mr. Thomas concluded that the Amoco patents could not be held unenforceable for inequitable conduct.

Finally, Mr. Thomas calculated a royalty rate applicable to the licensing of the Amoco patents. He began by stating that the license of the Amoco patents to Insta-Bulk in settlement of the litigation with Powertex was evidence of what a reasonable royalty would be in an arm's-length transaction. He then determined that a higher royalty rate was justified under the Tri-Podd license agreement because the rights granted therein did not restrict sales to a single customer and because of the provision including all improvement patents developed by the Podds.

Rather than analyzing the relevant factors identified in section 1.482-2(d)(2)(iii), Income Tax Regs., Mr. Thomas next proceeded to analyze 15 factors set forth in Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970), modified 446 F.2d 295 (2d Cir. 1971), which dealt with determination of the amount of a reasonable royalty to be paid by an infringer to the patent holder. Based on his analysis of such factors, he concluded that Mr. Podd could command a royalty in an arm's-length transaction of "greater than the 11% royalty for the restricted license of Insta-Bulk, probably 15%".

OPINION

1. Analysis of Arm's-Length Royalties for Use of
   Intangibles

   a. Section 482 in General

Section 482[6] gives respondent broad authority to allocate
income, deductions, credits, or allowances between commonly
controlled organizations, trades, or businesses if respondent
determines that the reallocation is necessary to prevent the evasion
of taxes or clearly to reflect the income of the controlled
entities. The purpose of section 482 is to prevent the artificial
shifting of the net incomes of controlled taxpayers by placing
controlled taxpayers on par with uncontrolled, unrelated taxpayers.
Seagate Tech., Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149,
163 (1994); Sundstrand Corp. v. Commissioner, 96 T.C. 226, 352-353
(1991); see also Bausch & Lomb, Inc. v. Commissioner, 92 T.C. 525,
581 (1989), affd. 933 F.2d 1084 (2d Cir. 1991); Edwards v.

---

[6]    Sec. 482 provides as follows:
       In any case of two or more organizations, trades, or
businesses (whether or not incorporated, whether or not
organized in the United States, and whether or not
affiliated) owned or controlled directly or indirectly by
the same interests, the Secretary may distribute, apportion,
or allocate gross income, deductions, credits, or allowances
between or among such organizations, trades, or businesses,
if he determines that such distribution, apportionment, or
allocation is necessary in order to prevent evasion of taxes
or clearly to reflect the income of any of such
organizations, trades, or businesses. In the case of any
transfer (or license) of intangible property (within the
meaning of section 936(h)(3)(B)), the income with respect to
such transfer or license shall be commensurate with the
income attributable to the intangible.

Commissioner, 67 T.C. 224, 230 (1976); sec. 1.482-1(b)(1), Income Tax Regs.

The Commissioner's authority to make allocations under section 482 is broad. Edwards v. Commissioner, supra at 230; PPG Indus., Inc. v. Commissioner, 55 T.C. 928, 990-991 (1970). The Commissioner's section 482 determination must be sustained absent a showing that he has abused his discretion. Paccar, Inc. v. Commissioner, 85 T.C. 754, 787 (1985), affd. 849 F.2d 393 (9th Cir. 1988). Consequently, the taxpayer bears the heavier than normal burden of proving that the Commissioner's section 482 allocations are arbitrary, capricious, or unreasonable.[7] Your Host, Inc. v. Commissioner, 489 F.2d 957, 960 (2d Cir. 1973), affg. 58 T.C. 10, 23 (1972); Seagate Tech., Inc. & Consol. Subs. v. Commissioner, supra at 164; G.D. Searle & Co. v. Commissioner, 88 T.C. 252, 359 (1987). Whether the Commissioner's discretion has been exceeded is a question of fact. American Terrazzo Strip Co., Inc. v. Commissioner, 56 T.C. 961, 971 (1971). In reviewing the reasonableness of the Commissioner's allocation under section 482, we focus on the reasonableness of the result, not the details of the

---

[7]   In the instant case, petitioners thus bear the burden of proving that respondent's downward adjustment of the royalty rate, pursuant to sec. 482, to 5 percent in the notices of deficiency is arbitrary, capricious, or unreasonable. Because respondent amended his answers to assert that the appropriate royalty rate, pursuant to sec. 482, should be 0 percent, the burden of proving that the royalty rate should be adjusted below 5 percent rests with respondent. Rule 142(a); see also supra note 2.

methodology employed.  Bausch & Lomb, Inc. v. Commissioner, supra at 582; see also Eli Lilly & Co. v. United States, 178 Ct. Cl. 666, 372 F.2d 990, 997 (1967).

In addition to proving that the deficiencies set forth in the notice of deficiency are arbitrary, capricious, or unreasonable, the taxpayer has the burden of proving satisfaction of the arm's-length standard.  See Sundstrand Corp. v. Commissioner, supra at 354.

b.  The Regulations in General

Section 1.482-2(d), Income Tax Regs., provides a framework for determining an arm's-length consideration for the transfer, sale, assignment or loan of intangible property or an interest therein between members of a group of controlled entities.  Section 1.482-2(d)(3)(ii)(a), Income Tax Regs., specifically identifies "patents" as intangible property.  Accordingly, we shall apply section 1.482-2(d), Income Tax Regs., in making our inquiry as to an arm's-length consideration for the rights Powertex received under the Tri-Podd license agreement.

An arm's-length consideration is defined specifically as "the amount that would have been paid by an unrelated party for the same intangible property under the same circumstances."  Sec. 1.482-2(d)(2)(ii), Income Tax Regs.  The best indication of such arm's-length consideration generally is transfers by the same transferor to unrelated parties for the same or similar intangible property under the same or similar circumstances.  Id.  If a sufficiently similar transaction involving an unrelated party is

unavailable, the arm's-length consideration is determined by evaluating various facts and circumstances. Sec. 1.482-2(d)(2)(iii), Income Tax Regs.

The relevant factors identified in section 1.482-2(d)(2)(iii), Income Tax Regs., for determining the amount of an arm's-length consideration where an adequately similar transaction is absent are:[8]

---

[8] Sec. 1.482-2(d), Income Tax Regs., was effectively superseded by sec. 1.482-4T, Temporary Income Tax Regs., 58 Fed. Reg. 5263, 5287 (Jan. 21, 1993), generally effective for taxable years beginning after April 21, 1993.

Additionally, sec. 482 was amended, for tax years beginning after Dec. 31, 1986, by the addition of the following sentence at the end thereof: "In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." Tax Reform Act of 1986, Pub. L. 99-514, sec. 1231(e)(1), 100 Stat. 2085, 2562-2563. The effect of the amendment to sec. 482 is that we may consider the _actual_ profits realized by the transferee through its use of the intangible property. H. Rept. 99-426, 425 (1985), 1986-3 C.B. (Vol. 2) 425 ("The committee does not intend, however, that the inquiry as to the appropriate compensation for the intangible be limited to the question of whether it was appropriate considering only the facts in existence at the time of the transfer. The committee intends that consideration also be given the actual profit experience realized as a consequence of the transfer.")

The statutory amendment to sec. 482 is apparently in conflict with sec. 1.482-2(d)(2)(iii)(g), Income Tax Regs., which provides that only the _prospective_ profits to be realized by the transferee through its use of the property may be considered in the determination of the amount of an arm's-length consideration (i.e., without consideration of subsequent _actual_ profits). See _Bausch & Lomb, Inc. v. Commissioner_, 92 T.C. 525, 601 (1989) ("Unlike both respondent and petitioners' experts, we find little relevance in B&L Ireland's actual results of operations during 1981 and 1982. Such information would not have been available in 1980 to a potential licensee negotiating a license agreement which was entered on January 1, 1981."), affd. 933 F.2d 1084 (2d

(continued...)

(a) The prevailing rates in the same industry or for similar property,

(b) The offers of competing transferors or the bids of competing transferees,

(c) The terms of the transfer, including limitations on the geographic area covered and the exclusive or nonexclusive character of any rights granted,

(d) The uniqueness of the property and the period for which it is likely to remain unique,

(e) The degree and duration of protection afforded to the property under the laws of the relevant countries,

(f) Value of services rendered by the transferor to the transferee in connection with the transfer within the meaning of paragraph (b)(8) of this section,

(g) Prospective profits to be realized or costs to be saved by the transferee through its use or subsequent transfer of the property,

(h) The capital investment and starting up expenses required of the transferee,

(i) The next subdivision is (j),

(j) The availability of substitutes for the property transferred,

(k) The arm's length rates and prices paid by unrelated parties where the property is resold or sublicensed to such parties,

(l) The costs incurred by the transferor in developing the property, and

(m) Any other fact or circumstance which unrelated parties would have been likely to consider in determining the amount of an arm's length consideration for the property.

c.  The Court's Holding as to the Arm's-Length Royalty Rate

We must decide whether the record contains a sufficiently similar transaction involving an unrelated party.  Petitioners point to the license agreement entered into between Powertex and Insta-Bulk in settlement of their litigation as a sufficiently similar transaction involving an unrelated party.  Respondent disagrees,

---

[8](...continued)
Cir. 1991).

primarily because the license was granted in settlement of litigation.  We agree with respondent.

Although we agree that the Powertex/Insta-Bulk license agreement covering the Amoco patents represents a transfer involving "the same or similar intangible property," we do not believe that the transfer occurred under "the same or similar circumstances" as the transfer in issue in the instant case.  We believe that the cross-license agreements which Powertex and Insta-Bulk entered into represent nothing more than the price at which those parties were willing to discontinue their litigation and do not necessarily establish an arm's-length royalty rate.  License fees negotiated in settlement of litigation may not be indicative of a true arm's-length royalty rate because of the incentive to avoid high litigation costs.  See Rude v. Westcott, 130 U.S. 152, 164 (1889); Panduit Corp v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1164 n.11 (6th Cir. 1978).  Consequently, we find that the Powertex/Insta-Bulk license agreement covering the Amoco liner was not a "sufficiently similar transaction" as contemplated by section 1.482-2(d)(2)(ii), Income Tax Regs.

Having found that the record does not contain a sufficiently similar transaction involving an unrelated party, we must attempt to construct an arm's-length royalty.  In doing so, we look to the relevant factors identified by section 1.482-2(d)(2)(iii), Income Tax Regs.

We are not completely satisfied with the methodology employed or the results reached by either party. We conclude that petitioner has shown that the royalty rate advanced by respondent is unreasonably low and therefore is arbitrary, capricious, and unreasonable. Seagate Tech., Inc. & Consol. Subs. v. Commissioner, supra; Sundstrand Corp. v. Commissioner, supra. On the other hand, we believe that the royalty rate advocated by petitioner is unreasonably high for the property involved in this case. We have evaluated all of the arguments raised by the parties. In reaching our conclusion, we draw on the record as a whole to determine the royalty rate at which we believe unrelated parties, under the facts and circumstances of the instant case, would have arrived for the intangibles in issue, see Sundstrand Corp. v. Commissioner, 96 T.C. at 383; Bausch & Lomb, Inc. v. Commissioner, supra at 597, and we concentrate only on those factors that we believe are necessary to a complete understanding of our holding as to what would be a reasonable arm's-length consideration for the license of the patent.

We have carefully scrutinized the experts' reports and the clarifying testimony given at trial by each expert as to his respective report. We are not constrained to follow the opinion of any expert when the opinion is contrary to our own judgment. We may adopt or reject expert testimony, whichever in our judgment is most appropriate. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285. We are not limited to choosing the

opinion of one expert over another, but may extract relevant findings from each in reaching our own conclusions. Chiu v. Commissioner, 84 T.C. 722, 734 (1985).

We find significant errors in the approach of each of the parties' experts in determining a reasonable royalty rate. For example, Mr. Parker proceeded under the assumption that a prospective licensee would have no doubts as to the validity, enforceability, and ownership of the Amoco patents. He made no attempt to quantify the differences between the licenses of the Sea Bulk patents and the license of the Amoco patents.

Mr. Thomas relied on the license of the Amoco patents by Powertex to Insta-Bulk in settlement of their litigation as a sufficiently similar transaction involving an unrelated party. As we noted above, however, the fact that this license was granted in settlement of litigation prevented it from being a sufficiently similar transaction for purposes of section 1.482-2(d)(2)(ii), Income Tax Regs. Additionally, we are puzzled as to his decision to examine the factors found in Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. at 1120, instead of those enumerated in section 1.482-2(d)(2)(iii), Income Tax Regs. Although some of the Georgia-Pacific Corp. factors are similar to those listed in the regulation, several are not. For example, the Georgia-Pacific Corp. factors include the derivative effect of selling the patented product in promoting sales of other products of the licensee and opinions from expert witnesses, factors which are not included in the regulation.

Finally, Mr. Thomas' basic approach was to rely on the Powertex/Insta-Bulk settlement license of the Amoco patents as evidence of a "clearly arm's-length transaction."  He then pointed to the advantages inherent in the Tri-Podd license agreement as justifying a royalty of "greater than * * * 11% * * * probably 15%", with no effort to quantify the effect of the asserted advantages.

As to Mr. Goldscheider, his entire opinion is grounded on Mr. Lutzker's opinion that the Amoco patents are invalid, unenforceable, and owned by Powertex.  He made no attempt to evaluate the relevant factors identified in section 1.482-2(d)(2)(iii), Income Tax Regs., and his reports added little to what was provided by Mr. Lutzker. Moreover, we found Mr. Goldscheider's demeanor at the trial to take away from his credibility, as he acted more like an advocate, rather than the independent and detached professional that he should have been.[9]

Consequently, we will evaluate the appropriate factors set forth in section 1.482-2(d)(2)(iii), Income Tax Regs., in order to

---

[9]    In a previous case before a Federal District Court in Texas, Mr. Goldscheider offered expert testimony on the subject of what a reasonable royalty would be and the judge in that case commented that Mr. Goldscheider's credibility was adversely affected due to his appearance as an advocate rather than a detached expert. Kerwit Medical Prods., Inc. v. N & H Instruments, Inc., 224 U.S.P.Q. 679, 691 n.6 (N.D. Tex. 1984). We will tolerate no less than detached neutrality from an expert witness.  See Estate of Halas v. Commissioner, 94 T.C. 570, 577-579 (1990).  An expert witness loses his usefulness and credibility by becoming merely an advocate for one side.  See, e.g., Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980).

determine the arm's-length consideration for the property transferred to Powertex.

In arriving at our conclusion, we begin by considering the prevailing royalty rates for intermodal container liners as established by the record.  The only liner for which we have data concerning licenses granted to unrelated third parties is the Sea Bulk liner.[10]  The record reveals that the license agreements for use of the Sea Bulk liner patents have provided many different royalty rates.  Sea-Land initially licensed the Sea Bulk patents to Tri-Wall Containers in exchange for royalties of 8 percent of net sales for the first year, 9 percent for the second year, and 10 percent for subsequent years.  Sea-Land licensed the Sea Bulk patents to Powertex initially for a 10-percent royalty, then included quantity discounts which could reduce the royalty first to 7 ½ percent and then to 5 percent, and finally for a flat 5 percent for all sales after September 30, 1985.[11]  Powertex sublicensed the Sea Bulk patents to Insta-Bulk in an agreement providing for 18-percent royalties in the first year and 20 percent thereafter.  The

---

[10]    Because the license by Powertex of the Amoco patents to Insta-Bulk was granted in settlement of litigation, we do not consider it useful here.

[11]    Mr. Parker, petitioner's expert, ignored the provision in the agreement requiring Powertex to also pay 10 percent of net sales for the purpose of marketing, advertising, and promotion when he evaluated the royalties payable by Powertex for use of the Sea Bulk patents.  We do likewise.

agreement was later amended to provide for royalties at a 13-percent rate, effective January 1, 1989.

Accordingly, by 1989, the Sea Bulk patents were being licensed at royalty rates of 5 percent and 13 percent. We believe that this range of royalties circumscribes the appropriate royalty rate to be paid for use of the Amoco patents as well.

Petitioners describe the Amoco patents as being superior to the Sea Bulk patents, and therefore capable of commanding higher royalty rates. We believe, however, that the Amoco patents can best be described as more specialized and designed for a particular use, whereas the Sea Bulk patents were intended for more general usage.

Petitioners also point to the substantial increase in profits of Powertex that resulted from sales of the Amoco liners as a factor to justify a high royalty rate. Although we agree that the Amoco patents were an important factor in generating those profits, we believe that they were not the only catalyst. During 1987, Amoco chose Powertex as its sole source of intermodal container liners, in part because they had developed a good working relationship and Powertex had agreed to build a facility near Amoco's Cooper River plant. The skill and expertise which the Podds had accumulated in designing and manufacturing liners also influenced the profitability of Powertex. Consequently, we do not agree with petitioners that the substantial increase in profits of Powertex is attributable exclusively to use of the Amoco patents.

The expert witnesses who appeared in the instant case presented us with an overwhelming amount of information and arguments concerning the validity, enforceability, and ownership of the Amoco patents. In our Order dated December 6, 1996, we stated that the parties were not permitted to introduce evidence to collaterally attack the validity of the patents in this Court, Adams v. Commissioner, 23 B.T.A. 71, 103 (1931), affd. 65 F.2d 262 (5th Cir. 1933); R.M. Smith, Inc. v. Commissioner, T.C. Memo. 1977-23, but that the parties were permitted to introduce such evidence to show the scope of the patents, the potential availability of noninfringing substitutes, the potential for litigation over the validity of the patents, and how such matters might affect the royalty rate that would be set by parties bargaining at arm's length. After evaluating the evidence and the arguments presented by the parties, we believe that a licensee of the Amoco patents would consider these issues when negotiating a royalty rate for their usage. See Smith v. Commissioner, T.C. Memo. 1981-219 ("a potential purchaser of a patent will consider its validity, difficulty of enforcement, and potential litigation as relevant to the amount it is willing to pay."), affd. without published opinion 691 F.2d 508 (9th Cir. 1982).

We believe that an evaluation of the foregoing factors results in a royalty towards the middle of the 5- to 13-percent range we identified above. Using our best judgment, and evaluating the record as a whole, we conclude that a royalty of 9 percent of net

sales of Amoco liners is a reasonable arm's-length consideration pursuant to section 482 for the intangibles in issue.[12]

III.  **Issue 2:  Whether Consulting Fees Paid by Powertex to Special Commodities Services, Inc. Are Ordinary and Necessary Business Expenses Deductible Under Section 162**

FINDINGS OF FACT

From 1983 through 1992, James L. Clark (Mr. Clark) was employed by Sea-Land as its Director of Corporate Terminal Operations and Director of Special Commodities Services.  His responsibilities included managing the license agreement between Powertex and Sea-Land, and providing technical support, marketing assistance, and advice for assisting Sea-Land's customers in using Sea Bulk liners. Pursuant to the license agreement between Sea-Land and Powertex, Mr. Clark was responsible for providing technical advice and marketing assistance to Powertex during the first year of the agreement, and, subsequently, for using his best efforts to assist Powertex in promoting Sea Bulk liners.

As a Sea-Land employee, Mr. Clark negotiated and executed the 1983 license agreement between Powertex and Sea-Land, several

---

[12]     Respondent also disallowed the royalty expense deductions claimed by Powertex under sec. 162 on the grounds that they were not ordinary and necessary business expenses, on the grounds that Powertex actually owned, or at least had shop rights in, the Amoco patents.  In light of our holding that a royalty of 9 percent constitutes an arm's-length consideration pursuant to sec. 482, such a royalty is deductible pursuant to sec. 162 as well.  See R.T. French Co. v. Commissioner, 60 T.C. 836, 849 (1973) (the arm's-length test commonly associated with sec. 482 is equally applicable in ascertaining the ordinary and necessary character of a payment to a related party that is deducted under sec. 162(a)).

amendments to the agreement lowering the royalty rate, Sea-Land's 1989 agreement to sell the Sea Bulk patents to Powertex, and Sea-Land's 1989 agreement to license its Sea Bulk trademark to Powertex. Mr. Clark also approved the sublicense agreement between Powertex and Insta-Bulk.

During 1983, Mr. Clark authorized Sea-Land to give free freight to Powertex for the shipment of liners to Powertex customers. Mr. Clark retired from Sea-Land on December 20, 1992. Subsequently, on March 19, 1993, the free freight arrangement for shipment of Powertex liners to customers was terminated by Sea-Land.

On July 11, 1983, Mr. Clark incorporated Special Commodities Services, Inc. (SCS) under the laws of the State of New Jersey. Mr. Clark was the president of SCS, and Mary J. Clark was its secretary and treasurer. The outstanding stock of SCS was owned 60 percent by Mr. Clark, 30 percent by Mary J. Clark, and 5 percent each by Dana J. and Mark A. Clark.

During or around November 1983, Powertex began making periodic payments to SCS. At some point, Mr. Podd and Mr. Clark executed an agreement "dated as of November 18, 1983" concerning these payments which provided:

> WHEREAS, SCS, Inc. was, in part, instrumental in Powertex's obtaining that exclusive license [the Sea-Land license] through consultations with Powertex during and subsequent to the negotiations between Powertex and Sea Land * * *
> WHEREAS Powertex and SCS, Inc. believe it to be in their mutual best interests for Powertex to continue to receive marketing and technical advice on the manufacture, marketing and sales of Sea Bulk units * * *

* * * * * * *

> Powertex hereby grants to SCS, Inc. for the full term
> of Powertex's exclusive licensing agreement with Sea Land
> Service on the SEA-BULK units and any extension thereof,
> this Consulting Agreement to utilize SCS, Inc.'s,
> technical expertise in the manufacturing, marketing and
> sale of the SEA BULK units throughout the world.

The agreement provided that notices to SCS should be sent to Mr. Clark's condominium located at 580 Patten Avenue, Unit #39, Long Branch, New Jersey 07740. Mr. Clark did not purchase the condominium until April 6, 1984.

Pursuant to the agreement, Powertex was required to pay SCS a "commission" of 2 ½ percent of net sales of Sea Bulk liners by Powertex and its sublicensee, Insta-Bulk. Beginning with the quarter ending September 30, 1987, through February 25, 1992, the "commission" was increased to 3 ½ percent of net sales of Sea Bulk liners, and, for sales by Insta-Bulk, the commission remained at 2 ½ percent. During the period from mid-1985 through February 25, 1992, Powertex paid approximately $927,451 to SCS pursuant to the agreement.

On October 26, 1995, Sea-Land filed a lawsuit in the Superior Court of New Jersey against Mr. Clark, Mary J. Clark, SCS, Powertex, and Mr. Podd, based on claims of fraud, commercial bribery, conspiracy, and breach of fiduciary duties in order to recover the payments made to SCS. The suit sought damages and demanded that SCS return the payments made by Powertex. The relevant portions of the complaint stated:

17. Unbeknownst to Sea-Land, in or about the time the Patent Licensing Agreement was negotiated and entered into between Powertex and Sea-Land, James Clark and Podd negotiated an additional compensation arrangement. In exchange for James Clark's insuring the "success" of the Patent Licensing Agreement, Podd agreed to pay James Clark a bribe or kickback equal to 2 ½% of the sales of Sea-Bulk liners by Powertex. Upon information and belief, the kickbacks to James Clark were increased to 3 ½% of sales in or about mid 1987.

18. In an effort to conceal the kickbacks paid to James Clark, Podd and Clark entered into a "consulting agreement" between Special Commodities Services, Inc. ("SCS") and Powertex. The consulting agreement was dated November 18, 1983 and executed by James Clark as the President of SCS, Mary Clark as the Vice President, Secretary and Treasurer of SCS, and Victor Podd as President of Powertex.

19. Upon information and belief, SCS was a shell corporation established by James Clark for the sole purpose of concealing the kickbacks paid by Victor Podd and Powertex to James Clark. Upon information and belief, James Clark provided no consulting services, or services of any kind, to Powertex or Victor Podd. All of James Clark's activities regarding Powertex were in his role as an employee of Sea-Land.

The lawsuit was settled in or around December 1996, with respect to Mr. Clark, Mary Clark, and SCS, and during or around January 1997, with respect to Powertex and Mr. Podd. The terms of the settlements were not submitted in evidence.

OPINION

In the notice of deficiency, respondent disallowed the $219,289 deduction claimed by Powertex for "consulting fees" paid to SCS for the fiscal year ending May 31, 1990. Respondent determined that the fees were neither ordinary and necessary business expenses nor expended for the designated purpose. Respondent did not assert that the deduction for payments to SCS should be disallowed under section 162(c) as an illegal bribe or kickback. We suspect that respondent's hesitancy to pursue a section 162(c)(2) argument is due

to the fact that respondent would bear the burden of proving, by clear and convincing evidence, that the payments were illegal and that the other requirements for disallowance under section 162(c)(2) are satisfied.  Brizell v. Commissioner, 93 T.C. 151, 161 (1989); sec. 1.162-18(b)(4), Income Tax Regs.  In any event, in the instant case, we need not examine the legality of the payments to SCS.

Deductions are a matter of legislative grace, and a taxpayer seeking a deduction must meet every condition that Congress has imposed for entitlement to the deduction claimed.  New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  To qualify as an allowable deduction under section 162(a) an item must (1) be paid or incurred during the taxable year; (2) be for carrying on any trade or business; (3) be an expense; (4) be a necessary expense; and (5) be an ordinary expense.  Commissioner v. Lincoln Sav. & Loan Association, 403 U.S. 345, 352 (1971).  Whether an expenditure is ordinary and necessary is a question of fact to be decided on the basis of all of the facts and circumstances.  Commissioner v. Heininger, 320 U.S. 467, 475 (1943); Hearn v. Commissioner, 309 F.2d 431, 431 (9th Cir. 1962), affg. 36 T.C. 672 (1961); Brizell v. Commissioner, supra at 156.

In general, an expense is ordinary if it is considered "normal, usual, or customary" in the context of the particular business out of which it arose.  Deputy v. Du Pont, 308 U.S. 488, 495-496 (1940).  An expense is necessary if it is "appropriate and helpful" to the

operation of the taxpayer's trade or business.  Welch v. Helvering,
290 U.S. 111, 113 (1933).

The test of deductibility of payments made for services is
whether the payments are reasonable and are in fact payments purely
for services which are actually rendered.  Achiro v. Commissioner,
77 T.C. 881, 903 (1981); sec. 1.162-7(a), Income Tax Regs.  What
matters is the nature of the services performed, and not the label
put on them by the payor and the payee.  Estate of Boyd v.
Commissioner, 76 T.C. 646, 658 (1981) (and cases cited therein).
Petitioners bear the burden of proving what portion of the fees is
allocable to deductible expenses.  Id.

Petitioners contend that SCS "rendered continuous, substantial,
and valuable consulting services to Powertex" and consulted with
Powertex on "marketing, advertising, business planning, customer
development, new products, finance, etc."  Petitioners, however,
submitted no records in evidence reflecting services performed by
SCS.  Mr. Podd testified that he would call Mr. Clark at all hours
of the day and night seeking "direction, leadership, [and] knowledge
of the industry".

Neither party called Mr. Clark to testify at trial.  Respondent
contends that petitioners' failure to call Mr. Clark allows us to
conclude that his testimony would not have supported their
arguments.

If a witness is equally available to both parties and neither
party calls that witness at trial, then no adverse inference is

warranted.  <u>Kean v. Commissioner</u>, 469 F.2d 1183, 1187-1188 (9th Cir. 1972), affg. on this issue and revg. on another issue 51 T.C. 337, 343-344 (1968).  It appears that Mr. Clark could have been subpoenaed by either petitioners or respondent.  Accordingly, we draw no inference from the fact that neither party subpoenaed Mr. Clark.

Nonetheless, several aspects of the relationship between Powertex, SCS, and Mr. Clark cause us to scrutinize the relationships between them.  During 1983, Mr. Clark negotiated and executed the license agreement between Powertex and Sea-Land.  During 1983, he also authorized Sea-Land to give free freight to Powertex for shipment of its liners.  Mr. Clark also incorporated SCS in 1983 and entered into the "consulting agreement" between SCS and Powertex.  The "consulting agreement" provides that SCS will provide "technical expertise in the manufacturing, marketing and sale of the Sea Bulk units".  Mr. Podd, however, admitted that Mr. Clark had no experience in the liner industry and that his expertise was in the refrigerated container industry.

Mr. Clark left Sea-Land during 1992, and, within 3 months, the free freight arrangement for shipment of Powertex liners was terminated by Sea-Land.  The Sea-Land lawsuit filed in 1995 describes the payments required by the "consulting agreement" as bribes or kickbacks and contends that all of Mr. Clark's activities with regard to Powertex were undertaken in his capacity as an employee of Sea-Land.  A deduction for a kickback has been allowed

when the payments were not shown by the Commissioner to be illegal and the taxpayer established that the payments were ordinary and necessary business expenses. See Brizell v. Commissioner, supra. In the instant case, however, petitioners consistently characterize the payments to SCS as consulting fees, and they do not contend that the payments are deductible as legal kickbacks. Moreover, even had they made such a contention, they have failed to produce any evidence which would suggest that kickbacks are normal and customary in the container liner industry. See id. at 157 (kickbacks found to be ordinary within the meaning of section 162(a) where the record contained ample evidence that such payments were common in the printing industry); Frederick Steel Co. v. Commissioner, 42 T.C. 13 (1964), revd. on other grounds 375 F.2d 351 (6th Cir. 1967) (commercial bribes not ordinary because there was no reliable evidence that other similar arrangements or practices were common in the industry); United Draperies, Inc. v. Commissioner, 41 T.C. 457 (1964), affd. 340 F.2d 936 (7th Cir. 1964) (taxpayer failed to show that it normally made such payments or that such payments were commonly made in the industry).

Based on the record before us, we conclude that petitioners have not established that Mr. Clark (individually or through SCS) provided any services to Powertex beyond those he provided in his capacity as an employee of Sea-Land. Consequently, we hold that

Powertex may not deduct the payments to SCS in 1990 in the amount of $219,289 as an ordinary and necessary business expense.[13]

IV. Issue 3: Whether Amounts Deducted by Powertex as Management Fees Paid to Powertex Plus International, Inc. Are Reasonable Payments for Services Rendered

FINDINGS OF FACT

During the years 1977 through 1990, the Podds and Mrs. Podd were Canadian citizens. From 1977 through 1983, the Podds and Mrs. Podd did not hold any immigration status or visa with the United States. During 1977, the Immigration and Naturalization Service (INS) detained Mr. Podd while he was crossing the United States/Canadian border and questioned him about his immigration status and right to work in the United States.

On September 19, 1977, Powertex Plus International, Inc. (Plus) was incorporated in Canada by Mr. Podd, originally under the name Powerweb Corporation, Ltd. Petitioners' law firm advised Mr. Podd

_____

[13] As we noted, the witness who could have offered the most illuminating testimony concerning the services provided by SCS, Mr. Clark, was not called to testify by either respondent or petitioners. Given the fact that Mr. Clark authorized Sea-Land to give free freight to Powertex for the shipment of liners to Powertex customers, the free freight arrangement was terminated shortly after Mr. Clark retired from Sea-Land, and thereafter Sea-Land filed suit to recover the payments from Powertex to SCS, the most plausible explanation for the payments is that they were kickbacks to Mr. Clark. Petitioners have obvious reasons for not contending that the payments were kickbacks, and respondent, as noted, may have been reluctant to characterize the payments as illegal kickbacks due to the burden of proof provision in sec. 162(c)(2). In any event, we are left with a less than adequate record concerning the SCS payments, and it is petitioners' burden to prove that such payments were ordinary and necessary business expenses.

to incorporate and receive wages from Plus in Canada because of the prohibition against a Canadian citizen's working in the United States without a visa.

During the years 1983 through 1990, Mr. Podd owned 28 percent of the outstanding stock of Plus, and Mrs. Podd, Stephen, and Victor, Jr. each owned 24 percent. Mr. Podd was its president, Mrs. Podd was its secretary, and Stephen and Victor, Jr. were vice presidents. The Podds and Mrs. Podd were also the only employees of Plus during this time period.

A "Management Agreement" dated June 1, 1983, and executed by Victor, Jr. as vice president of Powertex, and Mr. Podd as president of Plus provided that Plus would "operate" Powertex for the period from June 1, 1983, to May 30, 1984, in return for "compensation" of $120,000. The agreement provided that it could be terminated by mutual agreement and otherwise would be automatically renewed for successive 3 year terms. Mr. Podd and Victor, Jr. prepared three amendments to the management agreement increasing the "compensation" payable to Plus to $125,000 for fiscal year 1985, $175,000 for fiscal year 1987, and $250,000 for fiscal years 1988 through 1990. Although the amendments stated that they were executed on May 10, 1984, May 22, 1986, and May 11, 1987, they were not actually executed until late 1990 or early 1991.

Powertex made payments to Plus as follows:

| Date | Amount |
|------|--------|
| Aug. 31, 1987 | $50,000 |
| Oct. 22, 1987 | 75,000 |
| Mar. 10, 1988 | 75,000 |
| May 25, 1988 | 50,000 |
| Jan. 17, 1989 | 125,000 |
| May 26, 1989 | 125,000 |
| Mar. 2, 1990 | 125,000 |
| May 23, 1990 | 125,000 |

During the fiscal years ending May 31, 1984, through May 31, 1990, Powertex claimed deductions on its Federal corporate income tax returns for payments to Plus in the following amounts:

| Fiscal Year Ending | Amount |
|--------------------|--------|
| May 31, 1984 | $120,000 |
| May 31, 1985 | 125,000 |
| May 31, 1986 | 125,000 |
| May 31, 1987 | 175,000 |
| May 31, 1988 | 250,000 |
| May 31, 1989 | 250,000 |
| May 31, 1990 | 250,000 |

During the years 1983 through 1990, Plus' place of business was located at 255 Beverley Avenue, Montreal, Quebec, Canada, which was also used as a residence by Mr. Podd, Mrs. Podd, and Stephen during such years. Additionally, Powertex deducted expenses for an office maintained at the 255 Beverly Avenue address on its Federal corporate income tax returns for the fiscal years ending May 31, 1984, through May 31, 1990. During the same period, however, Powertex also maintained offices at the Rouses Point facility for use by the Podds and Mrs. Podd.

During the fiscal years ending May 31, 1989 and 1990, Powertex claimed depreciation deductions on its Federal corporate income tax returns for a desk, chair, and other standard office furniture located at 255 Beverly Avenue.  Powertex also paid the Podds' worldwide travel and entertainment expenses.  Plus paid the following wages in Canadian dollars:

| Year | Mr. Podd | Mrs. Podd | Victor, Jr. | Stephen |
|------|----------|-----------|-------------|---------|
| 1988 | $70,000 | $60,000 | $35,000 | $35,000 |
| 1989 | 61,525 | 61,525 | 49,215 | 49,215 |
| 1990 | 100,000 | 100,000 | 25,000 | 25,000 |

## OPINION

In the notices of deficiency, respondent adjusted the income of Powertex by disallowing the deductions claimed for management fees paid to Plus for the fiscal years ending in 1988 through 1990. Respondent determined that such amounts were neither ordinary and necessary business expenses nor expended for the purpose designated.

Deductions are a matter of legislative grace, and a taxpayer seeking a deduction must meet every condition that Congress has imposed for entitlement to the deduction claimed.  New Colonial Ice Co. v. Helvering, 292 U.S. at 440.  Section 162 generally allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business.  The determination of whether an expenditure satisfies the requirements of deductibility under section 162 is a question of fact to be

decided on the basis of all of the facts and circumstances. <u>Commissioner v. Heininger</u>, 320 U.S. at 475; <u>Hearn v. Commissioner</u>, 309 F.2d at 431; <u>Brizell v. Commissioner</u>, 93 T.C. at 156.

In general, an expense is ordinary if it is considered "normal, usual, or customary" in the context of the particular business out of which it arose. <u>Deputy v. Du Pont</u>, 308 U.S. at 495-496. An expense is necessary if it is "appropriate and helpful" to the operation of the taxpayer's trade or business. <u>Welch v. Helvering</u>, 290 U.S. at 113.

Management expenses are among the items included in business expenses. Sec. 1.162-1, Income Tax Regs. The test of deductibility of payments made for services is whether the payments are reasonable and are in fact payments purely for services which are actually rendered. <u>Achiro v. Commissioner</u>, 77 T.C. at 903; sec. 1.162-7(a), Income Tax Regs. What matters is the nature of the services performed, and not the label put on them by the payor and the payee. <u>Estate of Boyd v. Commissioner</u>, 76 T.C. at 658 (and cases cited therein). Petitioners bear the burden of proving what portion of the fees is allocable to deductible expenses. <u>Id.</u>

Petitioners argue that the amounts labeled as management fees paid from Powertex to Plus are deductible under section 162 as ordinary and necessary business expenses. Petitioners contend that Plus provided substantial, regular, and valuable management

services.  Mr. Podd testified that Plus provided Powertex services in the nature of "general guidance" and "direction".  More specifically, it was Mr. Podd's uncontroverted testimony that Plus reviewed sales invoices and entertained customers of Powertex.

Respondent contends that the fees paid to Plus are not deductible because they lacked a business purpose and because Plus was merely a holding company which failed to provide any significant services to Powertex.

Respondent does not argue that the management fee payments were not reasonable.  At trial, petitioners offered credible testimony that significant services were provided to Powertex through Plus. On the record before us, we hold that the payments made by Powertex to Plus as management fees during the years in issue were for services actually rendered and that, therefore, they are deductible under section 162.

## IV.  Issue 4:  Whether Individual Petitioners Received Constructive Dividends

### FINDINGS OF FACT

Respondent determined that the Podds and Mrs. Podd received constructive dividends from a variety of sources.[14]

---

[14]    On brief, respondent concedes that Mr. Podd did not receive dividend income of $2,749,501 from his constructive receipt of the Amoco patents from Powertex via the granting of patent rights in his name during 1989.  Petitioners conceded some of the items of dividend income in the stipulations of facts.  The only items

(continued...)

Respondent determined that Mr. Podd, Victor, Jr., and Stephen each received constructive dividend income of $228,678 during 1989 and $177,027 during 1990, which amounts are 1/3 of the disallowed royalty expenses claimed by Powertex of $686,034 during 1989 and $531,082 during 1990. Additionally, in accordance with respondent's determination that the $250,000 management fee expenses paid by Powertex to Plus for the 1988 through 1990 taxable years were not ordinary and necessary business expenses, respondent determined that such payments constituted constructive dividends. Initially, respondent determined in the notices of deficiency that Mr. Podd received $250,000 of constructive dividend income for 1988 and 1989, and that the Podds and Mrs. Podd received $250,000 of constructive dividend income for 1990. By way of amended answers, respondent also determined that Victor, Jr. and Stephen each received $250,000 of constructive dividend income for 1988 and 1989.

14(...continued)
of dividend income petitioners address on brief concern the constructive dividends that respondent determined were attributable to the disallowed management fees paid by Powertex to Plus and the disallowed royalty expenses. Accordingly, we consider the individual petitioners to have conceded that they received constructive dividends as determined by respondent, except as to those amounts related to the disallowed royalty and management fee expenses and the granting of patent rights to Mr. Podd during 1989. See Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988).

OPINION

A dividend is a distribution of property by a corporation to its shareholders out of its earnings and profits. Sec. 316(a). Dividends are taxable as ordinary income to shareholders to the extent of the earnings and profits of the corporation. Sec. 316. A dividend need not be formally declared or even intended by the corporation. Noble v. Commissioner, 368 F.2d 439, 442 (9th Cir. 1966), affg. T.C. Memo. 1965-84; Commissioner v. Makransky, 321 F.2d 598 (3d Cir. 1963), affg. 36 T.C. 446 (1961); Sachs v. Commissioner, 277 F.2d 879 (8th Cir. 1960), affg. 32 T.C. 815 (1959). Additionally, the distribution need not be made to a shareholder, but only for the shareholder's personal benefit. Cirelli v. Commissioner, 82 T.C. 335, 351 (1984); Edgar v. Commissioner, 56 T.C. 717 (1971). The determination of whether a constructive dividend has occurred is a question of fact which depends on each case. Hardin v. United States, 461 F.2d 865 (5th Cir. 1972).

The only argument petitioners advance with respect to the royalty payments is that the full amount of such payments is deductible as an ordinary and necessary business expense and therefore cannot be a constructive dividend. As discussed supra, we have found that the appropriate royalty rate for the patents licensed pursuant to the Tri-Podd license agreement is 9 percent. To the extent that royalty payments were made in excess of 9

percent, such amounts are not ordinary and necessary business expenses. Consequently, the excess is nondeductible expenditures made by Powertex for the personal benefit of its shareholders and constitute constructive dividends to the Podds. See Meridian Wood Prods. Co., Inc. v. United States, 725 F.2d 1183, 1191 (9th Cir. 1984); Falsetti v. Commissioner, 85 T.C. 332, 356-358 (1985); Challenge Manufacturing Co. v. Commissioner, 37 T.C. 650, 663 (1962).

With regard to the $250,000 management fee expenses paid by Powertex to Plus for the 1988 through 1990 taxable years, we held above that such payments were ordinary and necessary business expenses pursuant to section 162, and, accordingly, we hold that these payments are not constructive dividends.

## VI. Issue 5: Whether Victor, Jr. Was a Resident of the United States During 1990

### FINDINGS OF FACT

Victor, Jr. is a Canadian citizen. Beginning in 1970, the Podd family resided at their home at 255 Beverly Avenue, Mount Royal, Montreal, Canada. During 1984, Victor, Jr. was granted an H-3 Visa by the United States. On July 6, 1987, Victor, Jr. filed an application for resident alien immigration status with the Immigration and Naturalization Service (INS). On July 7, 1987, Victor, Jr. obtained a United States resident alien green card from the INS entitling him to resident alien status. From July 7, 1987,

through December 31, 1990, Victor, Jr. held resident alien immigration status with the United States.

During January 1989, Victor, Jr. met Ann Cohen, a resident of 6217-2 Bay Club Drive, Fort Lauderdale, Florida. Victor, Jr. and Ms. Cohen eventually began dating and were married on August 16, 1991.

During 1990, Victor, Jr. conducted business for Powertex in Florida by contacting and meeting with its Florida customers. Victor, Jr. utilized a phone, desk, and fax machine located in Ms. Cohen's apartment for conducting Powertex business. Victor, Jr. also utilized an automobile owned by Powertex while in Florida during 1990. On March 26, 1990, Powertex purchased mobile telephone service for Victor, Jr.'s use at Ms. Cohen's apartment. During or around May of 1990, Victor, Jr. transported a boat that he owned with Stephen from Rouses Point, New York to Fort Lauderdale, Florida, docking it at the marina servicing Ms. Cohen's apartment. In the insurance policy covering the boat, Victor, Jr. listed Ms. Cohen's apartment as his address and the address where the boat is normally kept.

On August 22, 1990, Victor, Jr. obtained a driver's license issued by the State of Florida. Again, Ms. Cohen's apartment is listed as his address. During 1990, Victor, Jr. incurred charges on

his credit card for 160 days in Florida and for 55 days in other locations in the United States.

For the 1990 taxable year, Victor, Jr. filed a Canadian resident income tax return. For the 1991 taxable year, Victor, Jr. claimed that he was a United States resident for income tax purposes and resided in Fort Lauderdale, Florida.

During 1990, Victor, Jr. also held a Quebec driver's license and belonged to a health club in Montreal. He owned two automobiles which were registered in Montreal and garaged at his parents' home. Many of his personal belongings remained in his parents' home. He maintained bank accounts at four Montreal banks in 1990. During 1990, he also received personal services from a doctor, a dentist, a hairdresser, and a tailor in Montreal.

## OPINION

For purposes of the Federal income tax, an alien individual will be treated as a resident alien of the United States with respect to any calendar year if, at any time during such calendar year, the individual is a lawful permanent resident of the United States. Sec. 7701(b)(1)(A)(i); sec. 301.7701(b)-1(b)(1), Proced. & Admin. Regs. An individual is a lawful permanent resident of the United States at any time if (1) the individual has the status of having been lawfully accorded the privilege of permanently residing

in the United States as an immigrant in accordance with the immigration laws (i.e., such individual holds a "green card"), and (2) that status has not been revoked (and has not been administratively or judicially determined to have been abandoned). Sec. 7701(b)(6); sec. 301.7701(b)-1(b)(1), Proced. & Admin. Regs. An alien individual who is issued a "green card" is considered a resident alien of the United States for United States income tax purposes on the first day that the individual is present in the United States as a lawful permanent resident, regardless of the number of days that the individual is present in the United States. Sec. 7701(b)(2)(A)(ii); sec. 301.7701(b)-4(a), Proced. & Admin. Regs.

Accordingly, because Victor, Jr. held a valid green card during 1990, he generally would be treated as a resident alien of the United States with respect to that year.  If, for income tax purposes, Canada also considered Victor, Jr. to be a resident of that country for 1990, he potentially would be subject to double taxation.  The United States-Canada income tax treaty (the treaty), however, provides a method for alleviating such potential.[15]  The

---

[15]    United States income tax treaties are on equal footing with domestic law in that both are "the supreme Law of the Land". U.S. Const. art. VI, cl. 2; see also sec. 894(a) ("The provisions of this title shall be applied to any taxpayer with due regard to
                                                        (continued...)

treaty provides a series of so-called "tie-breaker" rules for determining residence where an individual qualifies as a resident of both countries, as follows:

>       2.  Where by reason of the provisions of paragraph 1 an individual is a resident of both Contracting States, then his status shall be determined as follows:
>
>       (a) He shall be deemed to be a resident of the Contracting State in which he has a permanent home available to him; if he has a permanent home available to him in both States or in neither State, he shall be deemed to be a resident of the Contracting State with which his personal and economic relations are closer (centre of vital interests);
>
>       (b) If the Contracting State in which he has his centre of vital interests cannot be determined, he shall be deemed to be a resident of the Contracting State in which he has an habitual abode;
>
>       (c) If he has an habitual abode in both States or in neither State, he shall be deemed to be a resident of the Contracting State of which he is a citizen; and
>
>       (d) If he is a citizen of both States or of neither of them, the competent authorities of the Contracting States shall settle the question by mutual agreement.

---

[15](...continued)
any treaty obligation of the United States which applies to such taxpayer."); sec. 7852(d)(1) ("For purposes of determining the relationship between a provision of a treaty and any law of the United States affecting revenue, neither the treaty nor the law shall have preferential status by reason of its being a treaty or law.")

     If a treaty conflicts with a Federal law, the later in time will prevail.  Chae Chan Ping v. United States, 130 U.S. 581, 600 (1889); Whitney v. Robertson, 124 U.S. 190, 194 (1888); see also Lindsey v. Commissioner, 98 T.C. 672, 676 (1992), affd. without published opinion 15 F.3d 1160 (D.C. Cir. 1994).

[Convention Between the United States of America and Canada with Respect to Taxes on Income and on Capital, Sept. 26, 1980, art. IV, par. 2, T.I.A.S. No. 11,087, 1986-2 C.B. 258, 259, as amended by protocol, June 14, 1983, 1986-2 C.B. 270, and by second protocol, Mar. 28, 1984, 1986-2 C.B. 274 (hereinafter, Canada Convention).]

Paragraph 1 of the treaty defines the term "resident" as follows:

1. For the purposes of this Convention, the term "resident of a Contracting State" means any person who, under the laws of that State, is liable to tax therein by reason of his domicile, residence, place of management, place of incorporation or any other criterion of a similar nature, but in the case of an estate or trust, only to the extent that income derived by such estate or trust is liable to tax in that State, either in its hands or in the hands of its beneficiaries. [Canada Convention, art. IV, par. 1.][16]

Consequently, for the "tie-breaker" rules to apply, it must be shown that, in addition to being a resident of the United States, Victor, Jr. also is treated as a Canadian resident under Canadian law for the 1990 taxable year. Victor, Jr. has introduced evidence tending to show his physical, social, and personal nexus with Canada. Neither party, however, has introduced any evidence of the

---

[16] On Aug. 31, 1994, the United States and Canada signed a third protocol to the treaty. A revised protocol was signed by the United States and Canada on Mar. 17, 1995, and replaced the protocol signed during Aug. 1994. The revised protocol modified the definition of resident contained in article IV. The new definition, however, is not applicable to the year at issue.

A fourth protocol between the United States and Canada was signed in Ottawa during July 1997. On June 8, 1998, the IRS announced that the United States recently exchanged instruments of ratification for this protocol with Canada. Announcement 98-47, 1998-23 I.R.B. 5 (June 8, 1998).

Canadian law concerning residence.  In the absence of any evidence regarding the Canadian law for determining residence for income tax purposes, we conclude that Victor, Jr. was not a Canadian resident for income tax purposes in 1990.  See MacLean v. Commissioner, 73 T.C. 1045, 1053 (1980) (petitioner not considered a resident of the United Kingdom where he failed to cite any United Kingdom statutory or case law authority); Afshar v. Commissioner, T.C. Memo. 1981-241 ("where neither party has offered any material with respect to the applicable foreign law, we need not take judicial notice of such law"), affd. without published opinion 692 F.2d 751 (4th Cir. 1982). Accordingly, the "tie-breaker" rules of the treaty are inapplicable. Consequently, we hold that Victor, Jr. is a resident of the United States for 1990 pursuant to section 7701(b)(1)(A)(i).

VII.  Issue 6:  Additions to Tax and Penalties

FINDINGS OF FACT

Respondent determined additions to tax for negligence under section 6653(a)(1)(A) and (B), additions to tax for negligence under section 6653(a)(1), additions to tax for substantial understatements under section 6661(a), and accuracy-related penalties for negligence or substantial understatements under section 6662(a).  Respondent also determined additions to tax for failure to file tax returns

under section 6651(a)(1) and additions to tax for failure to make deposit of taxes under section 6656.

OPINION

1. Underpayment Due to Negligence

Section 6653(a)(1)(A) (and section 6653(a)(1)) imposes an addition to tax equal to 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(1)(B) provides for an addition of 50 percent of the interest payable under section 6601 on the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations. Section 6662(a) and (b)(1) imposes a penalty equal to 20 percent of the portion of the underpayment that is attributable to negligence or disregard of rules or regulations. Negligence includes a failure to make a reasonable attempt to comply with the provisions of the Internal Revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return. Sec. 6662(c). Negligence is a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Neely v. Commissioner, 85 T.C. 934 (1985). The term "disregard" includes any careless, reckless, or intentional disregard. Secs. 6653(a)(3),

6662(c); sec. 1.6662-3(b)(2), Income Tax Regs.  The section 6662

accuracy-related penalty does not apply with respect to any portion

of an underpayment if reasonable cause exists for the underpayment

and the taxpayer acted in good faith with respect to such portion.

Sec. 6664(c)(1).  The determination of whether the taxpayer acted

with reasonable cause and in good faith depends upon the pertinent

facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.

2.  <u>Substantial Understatement</u>

Section 6661 imposes an addition to tax in an amount equal to

25 percent of the underpayment of income tax if the underpayment is

attributable to a substantial understatement.  Section 6661 applies

to tax returns with a due date prior to January 1, 1990.  Section

6661 was repealed with regard to returns having a due date after

December 31, 1989, and recodified in section 6662.  Section 6662(a)

and (b)(2) imposes a penalty in an amount equal to 20 percent of the

portion of underpayment which is attributable to any substantial

understatement of income tax.

For purposes of sections 6661 and 6662(a), an understatement is

substantial if it exceeds the greater of 10 percent of the correct

tax or $5,000 or, in the case of a corporate taxpayer, $10,000.

Secs. 6661(b)(1)(A) and (B), 6662(d)(1)(A) and (B).  The term

"understatement" is defined as the excess of the amount of tax

required to be shown on the return for the taxable year over the amount of tax shown on the return for the taxable year reduced by any rebate. Secs. 6661(b)(2), 6662(d)(2)(A). In calculating understatements, items for which there was substantial authority or adequate disclosure are not to be considered. Secs. 6661(b)(2)(B)(i) and (ii), 6662(d)(2)(B)(i) and (ii).

3. Failure To File Tax Return

Section 6651(a)(1) provides for an addition to tax of 5 percent of the tax required to be shown on the return for each month or fraction thereof for which there is a failure to file, not to exceed 25 percent. The addition to tax for failure to file a return timely will be imposed if a return is not timely filed unless the taxpayer shows that the delay was due to reasonable cause and not willful neglect. Sec. 6651(a)(1).

4. Failure To Make Deposit of Taxes

Section 6656(a) imposes an addition to tax for failure to deposit timely a tax in a Government depositary, unless it is shown that such failure was due to reasonable cause and not due to willful neglect. For additions to tax assessed after October 21, 1986, the amount of the addition is 10 percent of the underpayment. Sec. 6656(a). For deposits required to be made after December 31, 1989,

the addition is 10 percent of the underpayment in cases where the delinquency persists for more than 15 days.

Petitioners argue that they are not liable for any of the penalties and additions to tax because they reasonably relied on the advice of competent tax experts.

If a taxpayer reasonably relies in good faith upon the advice of a competent tax professional in the preparation of the taxpayer's return, the penalties and additions to tax such as those in issue in the instant case may be inapplicable. See United States v. Boyle, 469 U.S. 241, 250-251 (1985) (failure to file); Vorsheck v. Commissioner, 933 F.2d 757, 759 (9th Cir. 1991) (substantial understatement); Weis v. Commissioner, 94 T.C. 473, 487 (1990) (negligence); Housden v. Commissioner, T.C. Memo. 1992-91 (failure to make deposit of taxes).

The individual petitioners were Canadian citizens unfamiliar with the U.S. tax system. They sought assistance from a certified public accountant in the United States in order to comply with the provisions of the Internal Revenue Code. The accountant for the individual petitioners and Powertex, Ronald R. Plante, a C.P.A. with Peat Marwick, testified as to his role in the preparation of petitioners' tax returns. Mr. Plante had a longstanding professional association with Powertex and the individual

petitioners, which began around 1977 or 1978.  Mr. Plante credibly testified that petitioners sought his advice in order to fulfill their tax obligations in the United States.  It is well documented in the record that petitioners relied upon the advice of Mr. Plante.

It is obvious that Mr. Plante possessed sufficient expertise in the field of tax law, and we believe that, with the exception of the issue concerning the deduction claimed by Powertex for consulting fees paid to SCS, petitioners provided him with the necessary and relevant information to prepare their tax returns.  After a careful review of the record, we hold that, based on all the facts and circumstances, except as to the SCS consulting fees issue, petitioners reasonably relied in good faith on the advice of Mr. Plante and are therefore not liable for the penalties and additions to tax as determined by respondent.

As to the SCS consulting fees issue, we hold that petitioners have not met the requirements of the reasonable cause exception that are necessary to avoid imposition of the section 6662(a) accuracy-related penalty.  If a taxpayer relies reasonably and in good faith upon the advice of a competent and experienced accountant in the preparation of the taxpayer's return, the penalty for negligence or the intentional disregard of rules or regulations is not applicable. Weis v. Commissioner, supra at 487.  To show good faith reliance,

the taxpayer must show that the return preparer was supplied with all the necessary information and the incorrect return was a result of the preparer's mistakes. <u>Pessin v. Commissioner</u>, 59 T.C. 473, 489 (1972); sec. 1.6664-4(c)(1)(i), Income Tax Regs.

Although petitioners' C.P.A., Ronald Plante, testified at trial, he did not state whether he was provided any information with respect to the SCS consulting fees issue. Under the circumstances, we hold that Powertex has failed to establish that it furnished Mr. Plante with necessary and relevant information with regard to the consulting fees paid to SCS and that the incorrect treatment of this issue was due to his mistakes. Accordingly, we hold that Powertex is liable for the section 6662(a) accuracy-related penalty with regard to the deduction claimed for consulting fees paid to SCS for the fiscal year ending May 31, 1990, as determined by respondent.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.